

SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re | Case No. 16-00982 |
| | Chapter 11 |
| NATURESCAPE HOLDING GROUP INTERNATIONAL, INC., | |
| Debtor. | |
| GEMCAP LENDING I, LLC, | Adv. Pro. No. 17-90007 |
| Plaintiff, | Dkt. No. 1, 104 |
| vs. | |
| TRENT A. BATEMAN, et al., | |
| Defendants. | |
| In re | Case No. 16-00984 |
| | Chapter 11 |
| MOUNTAIN THUNDER COFFEE PLANTATION INT'L, INC., | |
| Debtor. | |

| | |
|---|---|
| GEMCAP LENDING I, LLC, | Adv. Pro. No. 17-90008 |
| Plaintiff, | Dkt. No. 1, 100 |
| vs. | |
| TRENT A. BATEMAN, et al., | |
| Defendants. | |
| In re | Case No. 17-01101 |
| | Chapter 7 |
| TRENT ALLEN BATEMAN, | |
| Debtor. | |
| GEMCAP LENDING I, LLC, | Adv. Pro. No. 18-90002 |
| Plaintiff, | Dkt. No. 1 |
| vs. | |
| TRENT A. BATEMAN, | |
| Defendant. | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The trial of these adversary proceedings and an evidentiary hearing on a contempt motion[1] was held on August 7-10, 2018. Louise K. Y. Ing, Esq., Kristin Liisa Holland, Esq., Maile Osika, Esq. and Mark C. Taylor, Esq. appeared for plaintiff GemCap Lending I, LLC ("GemCap"). Frederick J. Arensmeyer, Esq.

---

[1] Dkt. 100.

U.S. Bankruptcy Court - Hawaii   #17-90008   Dkt # 168   Filed  10/02/18   Page 2 of 44

appeared for defendants Trent A. Bateman, Lisa J. Bateman, and Brooke Decker in Adv. Pro. No. 17-90008 and 17-90007. Christopher John Eggert, Esq. appeared for defendant Trent Allen Bateman in Adv. Pro. No. 18-90002.

Based on the evidence presented, and applying the clear and convincing standard of proof, I make the following

## FINDINGS OF FACT

### 1. The Parties

Debtor/defendants Mountain Thunder Coffee Plantation Int'l, Inc. ("Mountain Thunder") and Naturescape Holding Group, Int'l, Inc. ("Naturescape") were engaged in the coffee business. (I will refer to Mountain Thunder and Naturescape collectively as the "Borrowers."). The Borrowers purchased coffee from growers (and grew a small amount of coffee themselves), then processed and sold the coffee at wholesale and retail.

Defendants Trent A. Bateman and Lisa J. Bateman (collectively the "Batemans") are husband and wife. Defendant Brooke Decker is their daughter. At all relevant times, Mr. Bateman was the president of Mountain Thunder. He is not an officer or shareholder of Naturescape but he was heavily involved in the day-to-day management of that company.

The Borrowers conducted their business operations on several sites located on

3

the Island of Hawaii.[2]

The primary site for their business operations was at 73-1942 Hao Street, Kailua-Kona, Hawaii 96740 (the "Kaloko Property"). The Kaloko Property includes a kiosk and gift shop for retail customers, a coffee roasting kitchen, a wet mill, a dry mill, storage facilities for coffee and equipment, and residences occupied by the Batemans, Ms. Decker and her family, employees, and others. The Batemans' trusts own the fee simple interest in the Kaloko Property. The Batemans, as trustees and lessors, leased a portion of the Kaloko Property to Naturescape under a rental agreement dated December 22, 2015.[3]

The Borrowers also operated their business at 79-7469 Hawaii Belt Road, Kealakekua, Hawaii 96750 (the "Kainaliu Property"), 84-4995 Hawaii Belt Road, Captain Cook, Hawaii 96704 (the "Honaunau Wet Mill Property"), and 72-3375 Hawaii Belt Road, Captain Cook, Hawaii 96704 (the "Hualalai Ranch Property").

## 2.     The Original Loan Transaction

GemCap entered into a Loan and Security Agreement, dated September 26, 2011, with the Borrowers.[4] Mrs. Bateman signed the Loan and Security Agreement on behalf of Mountain Thunder and Ms. Decker signed on behalf of Naturescape.

---

[2] Trial Exhibit ("TE") G239 is a map showing the Borrowers' business locations.

[3] TE G43.

[4]  TE G1.

4

The Loan and Security Agreement provides that GemCap would extend to the Borrowers a term loan of $440,000 and a revolving line of credit of up to $1,550,000.

Pursuant to the Loan and Security Agreement, the Borrowers granted to GemCap a first priority security interest in and a lien on all of their assets, including after-acquired property.

GemCap's collateral included all "Equipment" of the Borrowers. Paragraph 1.40 of the Loan and Security Agreement provides that the "Equipment" includes, but is not limited to, the items listed in Exhibit 1.40 to the Loan and Security Agreement. TE G2 is the equipment list that was attached to the Loan and Security Agreement as Exhibit 1.40. Mr. Bateman actively participated in the construction of this list. GemCap asked Mr. Bateman to prepare the initial list for GemCap's review, and Mr. Bateman complied by providing lists, photographs, and other information about the equipment.[5]

GemCap's collateral also included all "Intellectual Property." As defined in paragraph 1.55 of the Loan and Security Agreement, "Intellectual Property" consists of every type of intellectual property "used in the conduct of the business of Borrower[s]," including "artwork," "customer and mailing lists," and the Borrowers' "entire customer list and database and all assets used or useful by Borrower in the conduct of its business over the internet or in any electronic medium, including any

_____

[5] TE G56, G57.

5

websites or domain names owned by Borrower."

Pursuant to paragraph 5.4(c) of the Loan and Security Agreement, the Borrowers represented that the liens granted to GemCap "constitute valid perfected first priority security interests in all of the Collateral in favor of the Lender . . . ."

The loan documents also included a Patent and Trademark Security Agreement, made by Mountain Thunder, Naturescape, and Tradewind Property Venture Group Ltd. D/B/A Mountain Thunder Corporation ("Tradewind"),[6] pursuant to which GemCap obtained security interests in patents, trademarks, and other intellectual property, including registered trademarks described as "Mountain Thunder" and "Island Café." The grantors represented that they owned the trademarks "free and clear of any and all Liens or claims of others."

GemCap's collateral included, not only all of the assets of the Borrowers and the related grantors, but also all proceeds generated by those assets. Thus, all of the Borrowers' receipts from the sale of coffee and other products were part of GemCap's collateral. To protect GemCap's interest in the proceeds, the Loan and Security Agreement required the Borrowers to deposit their collections in a lockbox account, for application to the outstanding balance of the revolving loan.[7] To fund their continuing operations, the Borrowers were permitted (subject to the terms of the loan

_____

[6] TE G5.

[7] TE G1 at 15.

6

agreements) to borrow against the revolving line of credit.

The Batemans as officers of Mountain Thunder, and Mrs. Bateman and Ms. Decker as officers of Naturescape, signed certificates[8] in which the Batemans and Ms. Decker certified to GemCap that "[t]he Company is the sole legal and beneficial owner of the Collateral, as defined in the Loan and Security Agreement," and that "[t]he representations and warranties of the Company contained in the [Loan and Security Agreement and other loan documents] are true and correct . . . ."

Mr. Bateman testified that he did not read any of the loan documents before signing them because his attorney insisted that he sign them immediately. (Mrs. Bateman and Ms. Decker did not testify at trial.)

GemCap and the Borrowers entered into an Amended and Restated Loan and Security Agreement, dated September 27, 2013.[9] This agreement reduced the term loan amount to $327,775.77 and increased the maximum borrowing limit on the revolving line of credit to $2,550,000. The other provisions of the original loan documents were restated as of the date of the amended and restated document and were not materially changed. Later, there were further amendments, but none changed the provisions referred to above.

The Batemans and Ms. Decker unconditionally guaranteed the obligations of

---

[8] TE G3, G4.

[9] TE G7.

U.S. Bankruptcy Court - Hawaii   #17-90008   Dkt # 168   Filed  10/02/18   Page 7 of 44

the Borrowers under the loan documents.[10] They reaffirmed their guaranties whenever the loan documents were amended.[11] They also mortgaged their fee simple interest in the Kaloko Property to secure the Borrowers' obligations to GemCap.[12]

The Loan and Security Agreement (and the amendment and restatement thereof) make the Borrowers "liable for all costs, charges and expenses, including attorney's fees and disbursements, incurred by Lender by reason of the occurrence of any Event of Default or the exercise of Lender's remedies with respect thereto . . . ."[13] Other loan documents have comparable provisions.[14]

When it entered into the loan documents and made the loans to the Borrowers, GemCap reasonably and justifiably relied on all of the representations made by the Borrowers, the Batemans, and Ms. Decker. GemCap would not have entered into the agreements or advanced any money under the loan documents if it had not believed that all of those representations were true and complete.

Mr. Bateman did not knowingly make any misrepresentations to GemCap at or prior to the inception of the loan transaction. All of the collateral described in the loan

---

[10] TE G13, G14.

[11] TE G15-18, 68-79.

[12] TE G92.

[13] TE G1 at 44, G7 at 45.

[14] TE G5 at 12, G13 at 6, G14 at 6.

8

documents was in fact the property of the Borrowers and the related grantors.

Mr. Bateman testified in these proceedings that some of the collateral listed in the loan agreements and the equipment certificates never belonged to the Borrowers but rather was his personal property. This testimony was false. When Mr. Bateman wanted GemCap to lend money to the Borrowers, Mr. Bateman consistently stated that all of the assets belonged to the Borrowers. Mr. Bateman only began to claim personal ownership of some of the assets after GemCap took steps to foreclose. Mr. Bateman's willingness to say whatever suits his family's interests at the moment makes his testimony incredible.

At trial, Mr. Bateman produced receipts for a few items of equipment purporting to show that he personally purchased them. He did not, however, offer any independent evidence that he paid for those items with his own funds, rather than with funds of the Borrowers. At any rate, even if he originally purchased some items personally, he contributed those items to the Borrowers and made them the Borrowers' property so the Borrowers could use them as collateral and borrow more money from GemCap.

3. Administration and Funding of the Loan

The amount that the Borrowers could draw on the revolving line of credit depended on (among other things) the amount of the Borrowers' "Eligible Accounts" and "Eligible Inventory," as defined. In order to draw on the revolving line of credit,

9

the Borrowers had to provide a borrowing base certificate, certified by a responsible officer, and including a schedule of the Borrowers' Eligible Accounts and Eligible Inventory and other information.[15] Mr. or Mrs. Bateman signed most of the borrowing base certificates as the responsible officer.[16]

Pursuant to paragraph 9.6(c) of the Loan and Security Agreement, the Borrowers promised to provide monthly certificates listing all of the Equipment then in their possession.[17] The Borrowers delivered many such equipment certificates.[18] Mr. or Mrs. Bateman signed all of the equipment certificates. Mr. Bateman also actively participated in the preparation of these equipment certificates. For example, in or around August 2015, Mr. Bateman reviewed and annotated a version of the equipment schedule.[19]

GemCap reasonably and justifiably relied on each of these borrowing base and equipment certificates, and the Borrowers' promise to deposit all of their receipts in the lockbox, when it advanced funds to the Borrowers. GemCap would not have made any of those advances if it had not believed that all of the certificates were complete

---

[15] TE G1 at 14-15. The Borrowers were obligated to provide borrowing certificates weekly, even if they did not request an advance against the revolving line of credit.

[16] TE G230 - G238.

[17] TE G1 at 34.

[18] TE G8.

[19] TE G54.

10

and accurate and that the Borrowers were depositing and would continue to deposit all of their receipts in the lockbox.

## 4.    Borrowers' Default and State Court Litigation

In 2015, the Borrowers defaulted in their obligations to GemCap. There were both payment and other defaults. The other defaults included the following:

- The Borrowers, under the direction of the Batemans and Ms. Decker, diverted $771,669 of their receipts (all of which were GemCap's collateral) from the lockbox account to other accounts controlled by the Borrowers, and spent the proceeds. All of this was in breach of the loan agreements.[20] Mr. Bateman caused the Borrowers to divert the receipts even though he knew that GemCap had security interests in the receipts and that the diversion would harm GemCap by effectively destroying some of its collateral.

- Unbeknownst to GemCap (until 2015), the Borrowers' borrowing base certificates were inflated.[21] Specifically, in 2013, the Borrowers obtained about 32,000 pounds of coffee from a third party for processing. The Borrowers processed the coffee and billed the third party for the processing. When the third party failed to pay, the Borrowers kept the coffee. On the borrowing base certificates, however, the Borrowers included the coffee in their reported

---

[20] TE G81 at 107, G277.

[21] TE G81 at 107-10.

11

inventory and also included the unpaid processing charge as an account receivable. But both of these statements could not have been true: either the Borrowers kept the coffee in satisfaction of the processing charge, in which case the Borrowers would have inventory but no account receivable; or the Borrowers were merely holding the coffee pending payment of the processing charge, in which case the Borrowers had a receivable but no inventory. The initial misrepresentation may have been inadvertent. But the Borrowers and the Batemans discovered the misrepresentation not long after it was made and deliberately failed to correct the error. In fact, they repeated the misrepresentation in 102 subsequent borrowing base certificates that they delivered to GemCap during the next two years. The Borrowers and the Batemans continued this deception so the Borrowers could continue drawing on the revolving line of credit and GemCap would not declare a default. The Batemans knew that concealment of this information would injure GemCap because they were inducing GemCap to lend money to Borrowers against nonexistent collateral.  The strategy worked: GemCap lent the Borrowers an additional $2,049,179.10 in reliance on the false borrowing base certificates. If GemCap had known the truth, it would have declared a default, stopped lending additional money to the Borrowers, and reduced its total losses by at least $2,049,179.10.

12

- Unbeknownst to GemCap (until years later) Tradewind assigned the trademarks, in which it had granted security interests to GemCap, to Mrs. Bateman's trust. The Borrowers and the Batemans did not inform GemCap of this transaction or obtain GemCap's consent.[22]

On September 29, 2015, Mr. Bateman contacted GemCap to arrange a refinance and forbearance agreement. Shortly thereafter, GemCap gave formal notice of default.[23]

GemCap, the Borrowers, the Batemans, and Ms. Decker entered into a Forbearance Agreement, dated November 10, 2015.[24] The Borrowers, the Batemans, and Ms. Decker acknowledged that they were in default of their obligations to GemCap and reaffirmed all of those obligations and their representations and warranties. GemCap agreed that, if the Borrowers satisfied certain conditions, GemCap would forbear from enforcing its remedies.

In late December 2015, alleging that the Borrowers had breached the Forbearance Agreement, GemCap filed suit in state court against the Batemans, Ms. Decker, and the Borrowers. The state court found that they were in default of their

---

[22] TE G82 at 5 and record citations therein.

[23] TE G82 at 5 and record citations therein.

[24] TE G19.

13

obligations under the agreements and appointed a receiver.[25] In response to the defendants' motion for reconsideration, the state court altered the order appointing the receiver and permitted Mr. Bateman to "resume his management of the coffee farm operations and business" under the receiver's supervision.[26]

Later, the state court entered a partial summary judgment in which it again found that the Borrowers were in default but deferred enforcement proceedings to give the Borrowers an opportunity to refinance their obligations to GemCap.[27]

## 5. Borrowers' Bankruptcy Cases and Asset Sale

GemCap was dissatisfied with the performance and decisions of the receiver in the state court proceedings. GemCap also disagreed with the state court's instructions to the receiver, especially its direction that the receiver allow Mr. Bateman to manage the business.

On September 16, 2016, GemCap and others filed involuntary bankruptcy petitions against Naturescape and Mountain Thunder. On December 20, 2016, this court entered an order for relief and appointed a trustee in each case. The trustee shut down the Borrowers' business operations in January 2017.

The trustee and GemCap entered into an Asset Purchase, Settlement and

---

[25] TE G22.

[26] TE G23. The state court later granted specific instructions to the receiver. TE G27, G28.

[27] *See also* TE G92.

U.S. Bankruptcy Court - Hawaii   #17-90008   Dkt # 168   Filed   10/02/18   Page 14 of 44

Release Agreement, dated as of March 8, 2017 ("Asset Purchase Agreement").[28]
Among other things, the trustee agreed to sell to GemCap the bankruptcy estates'
interest in all of GemCap's collateral.

The Asset Purchase Agreement provides that GemCap would pay the trustee for
the purchased assets partly in cash and partly by way of a credit bid in the amount of
$1,751,966.80.[29]

Naturescape, the Batemans, and Ms. Decker objected to the trustee's motion
for approval of the Asset Purchase Agreement.[30] They objected on multiple grounds
but they did not (at that time) claim ownership of any of the purchased assets.

The court entered an order approving the Asset Purchase Agreement.[31] The
order does not expressly require the Batemans or Ms. Decker to do or refrain from
doing anything.

GemCap "facilitated the transfer of the purchased assets" to Palani Farms, LLC
("Palani Farms"), an entity that is independent of GemCap (although it is wholly
owned by a former employee of GemCap). The agreement between GemCap and
Palani Farms is not part of the record, but there was uncontroverted testimony that
GemCap must compensate Palani Farms if Palani Farms does not obtain possession of

---

[28] TE G41.

[29] TE G41 at 9.

[30] Dkt. 316 in Bk. No. 16-00982.

[31] TE G83.

U.S. Bankruptcy Court - Hawaii   #17-90008   Dkt # 168   Filed   10/02/18   Page 15 of 44

all of the assets covered by the Asset Purchase Agreement.

The court also entered a separate order approving the assumption and assignment (to GemCap) of certain executory contracts and unexpired leases. The order provided that, "All persons or hereby barred, estopped, and permanently enjoined from interfering with the Assumption and Assignment."[32]

The sale of assets and assumption and assignment of leases closed on or shortly after April 13, 2017.[33]

## 6. Interference with the Asset Sale

The Batemans have taken many actions to interfere with GemCap's effort to enforce its rights in its collateral. These actions began around the time that the state court appointed the receiver, and continued and accelerated when the bankruptcy trustee sought approval of the Asset Purchase Agreement.

### A. *Misappropriation of Customer List.*

On January 12, 2016, very soon after the state court appointed the receiver, Mr. Bateman asked the Borrowers' internet consultant for the passwords to access mountainthunder.com and organickonacoffee.com, the internet domains used by the Borrowers. The consultant complied. Beginning within an hour and a half after Mr. Bateman received the passwords, Mr. Bateman (or, more likely, a person acting under

---

[32] TE G47.

[33] TE G42.

his direction) logged into the mountainthunder.com server and copied all of the data stored there, including retail customer lists. All of that data was the property of the Borrowers and was GemCap's collateral.

After the receiver was appointed, Mr. Bateman did not update the Borrowers' customer list (even though he was operating the business for the receiver).

Beginning in mid-2017, Mr. Bateman used (or allowed someone else to use) the copied customer list information to promote coffee made by "Green Forest Specialty Coffee Plantation."[34] At least one of the emails extends a "personal invitation" from "Trent Bateman" and "the Bateman family" to the Borrowers' customers. Mr. Bateman purposefully took the Borrowers' customer list, without the approval of the trustee, the receiver, or GemCap, to start a competing coffee business, intending to deprive GemCap of the value of its collateral.

Mr. Bateman refused to turn over the updated retail customer list even after this court enjoined him to do so. This harmed GemCap because it had access only to an outdated list of the Borrowers' retail customers.

Because Mr. Bateman refused to turn over the retail customer list to GemCap and Palani Farms, their sales to retail customers over the internet have been less than expected. GemCap proved the dollar amount of lost sales with sufficient certainty, but offered no evidence of the profit that it or Palani Farms could have earned from those

---

[34] TE G180-184.

U.S. Bankruptcy Court - Hawaii   #17-90008   Dkt # 168   Filed   10/02/18   Page 17 of 44

sales.

## B.    *Mountainthunder.com Domain Name.*

Mr. Bateman took the position (indeed, he testified under oath) that he, and not the Borrowers, owned the domain name that the Borrowers had used in connection with their business.[35]

Mr. Bateman's testimony was false. When the Borrowers wanted to borrow money from GemCap, Mr. Bateman represented that the Borrowers owned the domain name. He only changed his tune after he decided it was in his personal interest to do so. The domain name always belonged to the Borrowers and was included in GemCap's collateral. Mr. Bateman changed his story intending to use the domain name for the benefit of himself and his family and deprive GemCap of its collateral.

Mr. Bateman's position forced GemCap to seek a supplemental order confirming that the domain name www.mountainthunder.com was included in the purchased assets and directing the registrar of the domain name to transfer to Palani Farms the domain name and all other domain names associated with the Borrowers or the Batemans. The court entered an order[36] providing that, "All persons (including the Batemans) are hereby barred, estopped, and permanently enjoined from interfering

---

[35] "Moreover, the Debtors do not own the website mountainthunder.com. That domain is and always has been owned by me." Dkt. 397-1 at 2 in Bk. No. 16-00982.

[36] TE G46.

U.S. Bankruptcy Court - Hawaii   #17-90008   Dkt # 168   Filed   10/02/18   Page 18 of 44

with the relief granted pursuant to this Order." The registrar promptly complied (and also revealed that the domain name had been transferred from Ms. Decker to Mr. Bateman in January 2017.)[37]

The court entered a second supplemental order determining that the purchased assets included certain intellectual property of the Borrowers, including the Mountain Thunder trade name, and enjoining the Batemans from using that name or any variation thereof.[38]

## C.    *Equipment.*

Mr. Bateman contended that some of the equipment listed on the GemCap collateral schedules belonged to him personally, and not to the Borrowers. These claims were false; all of the assets described in those schedules were the property of the Borrowers, were included in the collateral of GemCap, were purchased by GemCap, and are now the property of Palani Farms.

Mr. Bateman refused to allow GemCap and Palani Farms access to the wet mill located on the Kaloko Property. As is noted above, the Batemans' trust owned the fee simple interest in that property and had rented it to the Borrowers under a rental

---

[37] TE G52.

[38] TE G93. Mrs. Bateman, as trustee of her trust, filed suit in the district court for an injunction restraining GemCap from foreclosing its security interest in the trademarks. She contended that Tradewinds had transferred the trademarks to her. The district court denied her request for a preliminary injunction. TE G82.

U.S. Bankruptcy Court - Hawaii   #17-90008   Dkt # 168   Filed   10/02/18   Page 19 of 44

agreement.[39] The rental agreement describes only in general terms the portion of the Kaloko Property that it covers. Mr. Bateman took the position that the wet mill was not covered because the rental agreement does not specifically mention the wet mill. Under the only reasonable interpretation, however, the rental agreement includes the wet mill because: (1) the Borrowers used the wet mill (just like the rest of the Kaloko Property other than the residences) to conduct their business; (2) at the time, the Batemans' trusts had no use for the wet mill apart from the Borrowers' business; (3) the Borrowers placed or stored some of GemCap's collateral in the wet mill; (4) the Borrowers used the GemCap loan proceeds to acquire the wet mill; and (5) the rental agreement was not made until after the Borrowers defaulted on their obligations to GemCap.[40] The Batemans created the rental agreement in a deliberate attempt to deprive GemCap of some of its collateral.[41] (After the court entered the preliminary injunction described below, Mr. Bateman allowed GemCap and Palani Farms access to the wet mill area, and Palani Farms was able to gain possession of all of the purchased assets that were then located on the Kaloko Property .)

Other items of GemCap's collateral are located on the Kainaliu Property. When the state court receiver was in possession of the Kainaliu Property, he would not

---

[39] TE G41 at 7 ¶ 2.1(f).

[40] TE G81 at 104.

[41] In the meantime, GemCap has foreclosed its mortgage on the Batemans' fee simple interest in the entire property. TE G6, G92.

U.S. Bankruptcy Court - Hawaii   #17-90008   Dkt # 168   Filed  10/02/18   Page 20 of 44

allow Palani Farms and GemCap access unless his representative and a representative of the Batemans was present. GemCap was able to enter the Kainaliu Property once and removed items that the receiver's representative believed were included in GemCap's collateral. But the receiver would not allow GemCap to remove other items claimed by GemCap and Palani Farms because the Batemans refused to meet again for a coordinated access to the property. These assets, which are listed in TE G176 under the heading "Purchased Assets Located at Kainaliu Property," were part of GemCap's collateral, are included in the purchased assets, remain on the Kainaliu Property, and belong to GemCap and Palani Farms.

Mr. Bateman testified that all of the items left on the Kainaliu Property "has [sic] considered abandoned and either has been or will be removed or destroyed."[42] This statement about abandonment is factually false (GemCap and Palani Farms never voluntarily gave up their rights in those items) and legally unsustainable (Mr. Bateman has offered no authority for the proposition that these items should be deemed abandoned). If any of those items have been destroyed, Mr. Bateman is accountable.

### D. Other Items.

Mr. Bateman refused to cooperate in the transfer to GemCap and Palani Farms of the business telephone numbers used by the Borrowers. Eventually, Palani Farms successfully transferred most of the numbers and it did not offer evidence of any

---

[42] Dkt. 31 in Adv. No. 18-90002 at 8 ¶ 58.

U.S. Bankruptcy Court - Hawaii  #17-90008  Dkt # 168  Filed  10/02/18  Page 21 of 44

economic loss it suffered due to Mr. Bateman's obstruction of the telephone number transfers.

Among the purchased assets were accounts receivable owed to the Borrowers. GemCap and Palani Farms were unable to collect most of the accounts at least partly because, when they took possession of the Borrowers' office after closing the asset purchase transaction, the relevant records were missing. This left GemCap and Palani Farms without documentation that the accounts were actually due and owing. Although the circumstances suggest that the Batemans or Ms. Decker concealed or destroyed the relevant records, I am unable to find that the evidence clearly and convincingly establishes that they did so, or that GemCap or Palani Farms would have collected all or a quantifiable portion of the accounts if they had the records. (The accounts may have been uncollectible for other reasons, such as the financial condition of the account debtors.)

7.  **Adversary Proceedings in the Naturescape and Mountain Thunder Cases.**

On April 20, 2017, GemCap filed complaints in this court against the Batemans and Ms. Decker.[43] GemCap seeks judgment requiring the defendants to turn over to GemCap the purchased assets and holding them in contempt for their failure to do so (Count I), cease interfering with Palani Farms' possession of the

---

[43] Adv. No. 17-90007, dkt. 1; Adv. No. 17-90008, dkt. 1. The complaints also asserted claims against Gold Winds, LLC, but GemCap later dismissed those claims. Adv. No. 17-90007, dkt. 102.

Kaloko Property (Count II), and cease interfering with the Assumption/Assignment Order (Count III). GemCap also seeks avoidance of certain prepetition asset transfers to the defendants (if the court finds that such transfers actually occurred) (Counts IV-X).[44]

After a hearing, the court entered a temporary restraining order prohibiting the the Batemans and Ms. Decker from using, transferring, or physically moving any of the purchased assets, or interfering with the sale of the assets, and requiring them to turn over to GemCap the domain and website www.mountainthunder.com, emails, telephone numbers associated with the Borrowers, and customer lists, to give GemCap access to the wet mill portion of the Kaloko Property, and to promptly identify the location and condition of all assets which the defendants claimed were their personal property.[45] The Batemans and Ms. Decker had actual knowledge of the temporary restraining order, and they could have complied with it. They chose, however, to disobey it: they did not turn over the domain and website (they instead forced GemCap to seek a further order from this court); they did not turn over emails, telephone numbers, or customer lists; they did not give GemCap access to the Kaloko Property; and they did not provide any further information about the assets that they

---

[44] Count XI is a request that the court conduct a joint pretrial conference with the state court. This procedural request is not a claim for relief that should be alleged as a separate count in a complaint. In any event, GemCap did not pursue it, so Count XI will be dismissed.

[45] Adv. No. 17-90007, dkt. 15.

U.S. Bankruptcy Court - Hawaii   #17-90008   Dkt # 168   Filed   10/02/18   Page 23 of 44

claimed belonged to them.

After a two-day evidentiary hearing, the court issued a preliminary injunction. Among other things, the preliminary injunction "directing the Enjoined Parties to immediately permit GemCap or its designee full, unfettered, and continuing unimpeded access to the Kaloko Property [except the defendants' personal residences], including, but not limited to. . . the Kaloko Wet Mill, and the Kainaliu Property," and to identify and turn over all of the purchased assets.[46]

The Batemans and Ms. Decker appealed the preliminary injunction to the district court.[47] They did not file an opening brief, and also did not respond to GemCap's motion to dismiss the appeal based on their failure to file a brief. The district court dismissed the appeal, and the time for appealing that dismissal has expired.[48]

The preliminary injunction is unambiguous, clear, and definite. The Batemans and Ms. Decker knew about it and were (and are) capable of complying with it. The Batemans and Ms. Decker failed to comply with the preliminary injunction: among other things, they did not give GemCap or its designee, Palani Farms, full, unfettered, and continuing unimpeded access to the Kainaliu Property. (As noted above, they did

---

[46] Adv. No. 17-90007, dkt. 34.

[47] Adv. Pro. 17-90007, dkt. 44.

[48] *See Trent A. Bateman, et al. v. Gemcap Lending I, LLC*, (Civil No. 17-cv-00287-LEK-KSC), United States District Court, D. Hawaii.

24

eventually give Palani Farms access to the wet mill portion of the Kaloko Property.) The equipment located on the Kainaliu Property was the collateral of GemCap and is included in the Asset Purchase Agreement. The undelivered equipment is worth $177,300.[49] The Batemans and Ms. Decker have also failed to turn over additional equipment worth a total of $85,000.[50] Their defiance of the temporary restraining order and preliminary injunction deprived GemCap and Palani Farms. Mr. Bateman withheld the equipment for the purpose of depriving GemCap of its collateral. He knew that his conduct was substantially certain to injure GemCap.

## 8. Continued State Court Litigation and Mr. Bateman's Bankruptcy Case

In the meantime, the bankruptcy filing against Naturescape and Mountain Thunder invoked the automatic stay and precluded GemCap from prosecuting the state court litigation against those entities. GemCap continued to prosecute the case against the Batemans, individually and as trustees of their trusts, and Ms. Decker.

On June 9, 2017, the state court entered a partial summary judgment decreeing the foreclosure of the mortgages that the Batemans had executed in favor of GemCap.

---

[49] TE G176 under the heading "Purchased Assets Located at Kainaliu Property."

[50] This is total value of the assets listed as "missing" in TE G176, except for those located on the Kainaliu Property. The same exhibit lists assets that were located but are inoperable. GemCap is not entitled to contempt damages for those items. The temporary restraining order and preliminary injunction did not require the defendants to maintain or repair any property; there is no evidence that the defendants deliberately damaged any of the assets (with the possible exception of the Gator described on line 38 of TE G176): there is evidence that someone put sugar in the gas tank of the Gator; but the evidence does not clearly and convincingly establish who put sugar there; and GemCap did not offer evidence of the costs it incurred to repair the Gator.

U.S. Bankruptcy Court - Hawaii   #17-90008   Dkt # 168   Filed   10/02/18   Page 25 of 44

The state court found that the amount owed to GemCap was $4,265,815.03 plus interest at $2,111.13 per day and attorneys' fees and costs.[51]

On August 30, 2017, GemCap filed a motion asking the state court to impose sanctions on the Batemans for their failure to comply with the court's discovery orders. GemCap asked the court to determine that the Batemans and Ms. Decker borrowed $700,000 from GemCap based on fraudulent representations about the Borrowers' inventory and for fraudulently diverting the Borrowers' assets to themselves.

The state court orally granted the motion at a hearing held on October 2, 2017.

Mr. Bateman filed his personal bankruptcy petition on October 22, 2017. This invoked the automatic stay.

The state court entered its written order granting GemCap's motion on November 6, 2017 (the "Contempt Order").[52] The court found, among other things, that:

- "The Batemans and Decker fraudulently reported on their borrowing base that Mountain Thunder and Naturescape had approximately 32,000-38,000 pounds of coffee ('Diverted Coffee') available for roasting and sale and received funding from GemCap based on this fraudulent reporting."

_____

[51] TE G92.

[52] TE G97.

26

- "The Diverted Coffee represented $700,000 worth of funding borrowed from GemCap."

- "The Batemans and Decker operated Mountain Thunder and Naturescape as their alter egos."

- "The Batemans and Decker fraudulently transferred at least **$900,370** to themselves with actual intent to hinder, delay and defraud GemCap . . . ."[53]

The state court made these findings as a discovery sanction. The evidence (if any) that GemCap presented to the state court to support these findings is not part of the record in these cases.

Mr. Bateman moved the state court to strike the written order on the ground that its entry violated the automatic stay. The state court denied the motion without prejudice, reasoning that the court made its oral ruling before the bankruptcy filing and that the subsequent entry of the written order was a ministerial act excepted from the automatic stay.[54]

On December 22, 2017, GemCap filed a motion in Mr. Bateman's bankruptcy case seeking relief from the automatic stay to permit the continued prosecution of Adv. Nos. 17-90007 and 17-90008 in this court and to permit completion of a

---

[53] *Id.* (emphasis in original).

[54] TE G260.

U.S. Bankruptcy Court - Hawaii   #17-90008   Dkt # 168   Filed  10/02/18   Page 27 of 44

foreclosure proceeding in the state court.[55] The motion explained that GemCap had

sought discovery sanctions in the state court proceeding, that the state court had

entered the findings and conclusions "through ministerial action" after Mr. Bateman

filed his bankruptcy petition, and that the state court had denied the motion to strike

its order. But GemCap's motion did not seek retroactive relief from the automatic stay

with respect to those findings and conclusions.

Mr. Bateman filed a response to the motion in which he did not object to the

requested relief but argued that the stay should continue to protect him against

monetary judgments.[56]

GemCap filed a reply that acknowledged Mr. Bateman's limited objections and

"attached . . . a proposed order modified to take Bateman's objections to the relief

requested in the Motion into account."[57] The proposed order included a proviso "that

the automatic stay shall not be lifted to permit GemCap to seek further monetary

judgments against Bateman personally in connection with the foreclosure

proceedings," as Mr. Bateman had requested. But GemCap's counsel also added a

provision that the stay would be lifted "to allow the State Court to enter the Proposed

Second Contempt Order and Proposed FOF/COL . . . ." GemCap did not request

---

[55] Bk. No. 17-01101, dkt. 28.

[56] Bk. No. 17-01101, dkt. 38.

[57] Bk. No. 17-01101 dkt. 43.

U.S. Bankruptcy Court - Hawaii   #17-90008   Dkt # 168   Filed  10/02/18   Page 28 of 44

this relief in its motion and its reply memorandum did not mention this change. (Moreover, calling the state court's orders "proposed" at that point was misleading; the state court had entered those orders two months earlier.)

After one more (unrelated) change to the order was made, Mr. Bateman's counsel approved the order as to form, including the added language that expanded the relief beyond that requested in the motion. I failed to notice that provision for retroactive relief, and I signed the order.[58]

On January 12, 2018, GemCap filed the complaint that commenced Adv. No. 18-90002. The complaint seeks a judgment determining that Mr. Bateman's debt to GemCap (i.e., the total unpaid balance of GemCap's loans to the Borrowers that Mr. Bateman guaranteed) is not dischargeable in bankruptcy under sections 523(a)(2) and (6).

Based on these findings of fact, I draw the following

## CONCLUSIONS OF LAW

1. **Jurisdiction and Venue**

The bankruptcy court has personal jurisdiction of the parties. Venue is proper in this district.

The bankruptcy court has subject matter jurisdiction because all of the claims in these adversary proceedings "arise in" one or more of the main bankruptcy cases, "arise

---

[58] Bk. No. 17-01101 dkt. 47.

U.S. Bankruptcy Court - Hawaii   #17-90008   Dkt # 168   Filed 10/02/18   Page 29 of 44

under" the Bankruptcy Code, or are "related to" one or more of the main bankruptcy cases.[59] All of the claims are "core proceedings."[60]

None of the remaining defendants has a right to a trial by jury on any of the claims in the complaints.

## 2. General Conclusions

All of the loan documents described in the findings of fact, including (but not limited to) the Loan and Security Agreement, the Forbearance Agreement, the guarantees executed by the Batemans and Ms. Decker, and the amendments thereto, are valid and enforceable in accordance with their terms.

The security interests, liens, and other interests in property granted to GemCap under those documents are valid and duly perfected. The Borrowers and the related grantors owned all of the property in which they granted security interests to GemCap.

The loan documents are fully binding and enforceable against the Borrowers, the Batemans, and Ms. Decker, even if Mr. Bateman did not read those documents.[61]

---

[59] 28 U.S.C. § 157(a).

[60] 28 U.S.C. § 157(b).

[61] "'The general rule of contract law is that one who assents to a contract is bound by it and cannot complain that he has not read it or did not know what it contained.'" *Courbat v. Dahana Ranch, Inc.*, 111 Haw. 254, 264 (2006), *quoting Leong v. Kaiser Found. Hosps.*, 71 Haw. 240, 245 (1990). A different rule might apply if the Borrowers or Mr. Bateman were the victims of fraud in the factum, i.e., that they were fraudulently induced to sign the documents based on false representations about the nature of the documents. *Chang v. Crouch* (*In re Hokulani Square, Inc.*), 413 B.R. 706, 714 (Bankr. D. Haw. 2009). But there is no credible evidence of fraud in the factum

30

The Borrowers are in material default of their obligations under the loan documents.

## 3. Nondischargeability Claims against Trent Bateman

### A. The Legal Standards.

#### 1) *Section 523(a)(2)(A)*.

Section 523(a)(2)(A) provides that a chapter 7 discharge does not discharge an individual from any debt for money to the extent that the debtor obtained it by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . ."[62]

Exceptions to discharge must be strictly construed in favor of the debtor in order to effectuate the Bankruptcy Code's goal of giving debtors a fresh start.[63]

An express misrepresentation is not always required to prove "false pretenses, a false representation, or actual fraud." For example, "[a] debtor's misleading conduct intended to convey an inaccurate impression may constitute 'false pretenses.'"[64]

---

in this case.

[62] 11 U.S.C. § 523(a)(2)(A).

[63] *Snoke v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992 ) (citing *In re Klapp*, 706 F.2d 998, 999 (9th Cir. 1983)).

[64] *Kane v. Torres (In re Torres)*, Adv. No. 10-90005, 2011 WL 381038, at *5 (Bankr. D. Haw. Feb. 2, 2011) (citing *In re Felton*, 197 B.R. 881, 889 (N.D. Cal.1996) (conduct creating a false pretense or false representation can justify nondischargeability under section 523(a)(2))); *see also Shannon v. Russell (In re Russell)*, 203 B.R. 303, 312 (Bankr. S. D. Cal. 1996) ("[F]alse representation is an express misrepresentation, while false pretense refers to implied misrepresentation of 'conduct intended to create and foster false impression.'").

U.S. Bankruptcy Court - Hawaii   #17-90008   Dkt # 168   Filed  10/02/18   Page 31 of 44

Further, the term "actual fraud" includes forms of fraud, such as fraudulent conveyance schemes, that can be effected without any false representation.[65] Therefore, section 523(a)(2)(A) encompasses more than just common law fraud.[66]

But common law fraud remains the paradigm case under section 523(a)(2)(A). Thus, a creditor can prevail by proving five elements:

(I)      Misrepresentation, fraudulent omission, or the debtor's deceptive conduct;

(ii)     Knowledge of the falsity or deceptiveness of his statement or conduct;

(iii)    An intent to deceive;

(iv)     Justifiable reliance by the creditor on the debtor's statement or conduct; and

(v)      Damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.[67]

Justifiable reliance is a lower standard of care than reasonable reliance. A

---

[65] *Husky International Electronics, Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016) ("Congress did not intend 'actual fraud' to mean the same thing as 'a false representation'").

[66] *Husky* implicitly overrules earlier Ninth Circuit decisions holding (or implying) that section 523(a)(2)(A) is limited to common law fraud. *See Household Credit Services, Inc. v. Ettell (In re Ettell)*, 188 F.3d 1141, 1144 (9th Cir. 1999); *Citibank v. Eashai (In re Eashai)*, 87 F.3d 1082, 1086 (9th Cir. 1996). *Husky* also implicitly overrules decisions that the terms "false pretenses," "false representation," and "actual fraud" are synonymous. *See e.g. Mandalay Resort Group v. Miller (In re Miller)*, 310 B. R. 185, 201-02 (Bankr. C. D. Cal. 2004) ("[U]nder Ninth Circuit law, the terms 'false pretenses' and 'false representation' have the same meaning in Section 523(a)(2)(A) as the term 'actual fraud.' In consequence, they cannot provide a basis independent of actual fraud, for finding a debt nondischargeable.").

[67] *Dietz v. Ford (In re Deitz)*, 760 F.3d 1038, 1050 (9th Cir. 2014) (citing *Oney v. Weinberg (In re Weinberg)*, 410 B.R. 19, 35 (B.A.P. 9th Cir. 2009)).

32

creditor acts in "justifiable reliance" on a debtor's misrepresentation if the creditor did not have notice of the debtor's fraud.[68] The creditor may justifiably rely on a misrepresentation even if a reasonable investigation would have uncovered the fraud.[69] But the creditor may not succeed in a section 523(a)(2)(A) action if the creditor had notice of the fraud.[70] "The inquiry will thus focus on whether the falsity of the representation was or should have been readily apparent to the individual to whom it was made."[71]

## 2) *Section 523(a)(2)(B)*.

If the challenged statement is about the "financial condition" of the debtor or an insider,[72] then the creditor must prove that (1) the statement was in writing; (2) the statement was "materially false," (3) the statement concerned "the debtor's or an insider's financial condition," (4) the creditor "reasonably relied" on the statement,

---

[68] 11 U.S.C. § 523(a)(2)(A); *Field v. Mans*, 516 U.S. 59, 69-76 (1995); *Citibank (South Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1090-91 (9th Cir. 1996).

[69] *In re Eashai*, 87 F.3d at 1089.

[70] *Id.*

[71] *1726, Inc. v. Ramirez, (In re Ramirez)*, 2015 WL 4480901, at *6 (Bankr. D. Haw. July 21, 2015) (internal quote marks omitted).

[72] Mountain Thunder and Naturescape are "insiders" of Mr. Bateman. If the debtor is an individual, the term "insider" includes, but is not limited to (11 U.S.C. § 102(3)), a "corporation of which the debtor is a director, officer, or person in control." 11 U.S.C. § 101(31)(A)(iv). Mr. Bateman is an officer of Mountain Thunder and was, at least until the appointment of the receiver and the bankruptcy trustee, a "person in control" of Naturescape.

33

and (5) the debtor "made or published" the statement with "intent to deceive."[73]

The phrase "a statement respecting the debtor's . . . financial condition" includes a statement about a single asset.[74] Cases holding that section 523(a)(2)(B) applies only to statements "'that purport to present a picture of the debtor's overall financial health'"[75] are no longer good law.

### 3) *Section 523(a)(6)*.

Section 523(a)(6) excepts from discharge any debt arising from "willful and malicious injury by the debtor to another entity or to the property of another entity[.]"[76] The creditor must prove both willfulness and malice.[77] "A 'willful' injury is a 'deliberate or intentional **injury**, not merely a deliberate or intentional **act** that leads to injury.'"[78] The willful injury requirement under section 523(a)(6) "is met only when the debtor has a subjective motive to inflict injury or when the debtor believes that injury is substantially certain to result from his own conduct."[79]

---

[73] 11 U.S.C. § 523(a)(2)(B).

[74] *Lamar, Archer & Cofrin, LLP, v. Appling*, 138 S.Ct. 1752, 1761 (2018).

[75] *Barnes v. Belice (In re Belice)*, 461 B.R. 564, 578 (B.A.P. 9th Cir. 2011) (quoting *Cadwell v. Joelson (In re Joelson)*, 427 F.3d 700, 714 (10th Cir. 2005)).

[76] 11 U.S.C. § 523(a)(6).

[77] *Ormsby v. First Am. Title Co. of Nev. (In re Ormsby)*, 591 F.3d 1199, 1206 (9th Cir. 2010).

[78] *Barboza v. New Form, Inc. (In re Barboza)*, 545 F.3d 702, 706 (9th Cir. 2008) (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998)) (emphases in original).

[79] *In re Ormsby*, 591 F.3d at 1206.

34

### B. Preclusive Effect of State Court Contempt Order.

GemCap argues that the state court's Contempt Order[80] has issue preclusive effect in these proceedings and that it establishes the elements of section 523(a)(2) and (a)(6).

Principles of collateral estoppel (now usually called issue preclusion) apply in bankruptcy proceedings concerning nondischargeability.[81] "The Full Faith and Credit Act requires that the federal courts give state court judgments the same preclusive effect those judgments would enjoy under the law of the state in which the judgment was rendered."[82] Thus, Hawaii preclusion law applies.

> [F]our requirements must be satisfied before issue preclusion may be applied in any case: (1) the issue decided in the prior adjudication is identical to the one presented in the action in question; (2) there is a final judgment on the merits; (3) the issue decided in the prior adjudication was essential to the final judgment; and (4) the party against whom [issue preclusion] is asserted was a party or in privity with a party to the prior adjudication. Additionally, issue preclusion should be qualified or rejected when its application would contravene an overriding public policy or result in manifest injustice.[83]

Mr. Bateman argues that the Contempt Order does not have preclusive effect for two reasons.

---

[80] TE G97.

[81] *Grogan v. Garner*, 498 U.S. 279, 284 n. 11 (1991).

[82] *Lopez v. Emergency Service Restoration, Inc. (In re Lopez)*, 367 B.R. 99, 105 (B.A.P. 9th Cir. 2007) (citations omitted); *see also In re Ormsby*, 591 F.3d at 1205.

[83] *Exotics Hawaii-Kona, Inc. v. E.I. Dupont De Nemours & Co.*, 104 Haw. 358, 372 (2004) (internal quotation marks omitted).

U.S. Bankruptcy Court - Hawaii   #17-90008   Dkt # 168   Filed  10/02/18   Page 35 of 44

First, he argues that the Contempt Order is void because its entry violated the automatic stay. It is true that acts taken in violation of the stay are void.[84] But this court subsequently granted retroactive relief from the automatic stay.[85]

Second, he argues that the Contempt Order was not a "final judgment" because the state court never issued a separate judgment in compliance with Haw. R. Civ. P. 58. For purposes of preclusion, a final judgment is one from which an appeal may be taken as a matter of right.[86] While the Hawaii appellate courts strictly enforce the separate judgment requirement,[87] they also follow the "collateral order" doctrine. "An order imposing sanctions for failure to provide discovery and directing immediate

---

[84] *Griffin v. Wardrobe (In re Wardrobe)*, 559 F.3d 932 (9th Cir. 2009); *Schwartz v. United States (In re Schwartz)*, 954 F.2d 569, 571 (9th Cir. 1992).

[85] The state court ruled that the entry of the Contempt Order was a "ministerial act" that did not violate the stay. I respectfully disagree. "Ministerial acts or automatic occurrences that entail no deliberation, discretion, or judicial involvement do not constitute continuations of such a proceeding." *McCarthy, Johnson & Miller v. North Bay Plumbing, Inc. (In re Pettit)*, 217 F.3d 1072, 1080 (9th Cir. 2000). The entry of a written order by a judge after an oral ruling does not meet this standard because, at a minimum, it entails some "judicial involvement." This is particularly so because a judge is always free to enter a written order that varies from the oral ruling. *Rawson v. Calmar Steamship Corp.*, 304 F.2d 202, 206 (9th Cir. 1962) ("The trial judge is not to be lashed to the mast on his off-hand remarks in announcing decision prior to the presumably more carefully considered deliberate findings of fact."). The ministerial act exception might conceivably apply if the judge had signed the order before the bankruptcy petition was filed, leaving only the clerk's ministerial obligation to enter the judgment. But this is not such a case.

[86] Under Hawaii law, a judgment does not have preclusive effect until the time for taking an appeal expires and, if an appeal is taken, the appeals are decided. *Morisada Corp. v. Beidas*, 939 F.Supp. 732, 737 n. 3 (D. Haw. 1995). It follows that a non-appealable order cannot have preclusive effect, because the time for appealing such an order has not begun to run, let alone expired.

[87] The Hawaii state courts adopted the strict enforcement policy in *Jenkins v. Cades Schutte Fleming & Wright*, 76 Haw. 115 (1994), and continue to apply it today (although they have adopted procedures to mitigate some of its harsh effects), *State v. Joshua*, 141 Haw. 91 (2017).

U.S. Bankruptcy Court - Hawaii   #17-90008   Dkt # 168   Filed 10/02/18   Page 36 of 44

payment of costs to opposing party may be immediately appealed under the collateral order doctrine."[88] Thus, the Contempt Order was a final judgment for preclusion purposes.

I decline, however, to give the Contempt Order issue preclusive effect against Mr. Bateman because doing so would result in manifest injustice. The Contempt Order would be void (as to Mr. Bateman) but for the retroactive relief provision in my order granting relief from the automatic stay. But GemCap's counsel inserted the relevant provision in the order with their reply memorandum and without calling attention to it, and the language of that provision is misleading. In the circumstances, it would be manifestly unjust to give the Contempt Order issue preclusive effect against Mr. Bateman.

## C.    *Application of Section 523 to This Case.*

Mr. Bateman did not commit fraud, within the meaning of section 523, when the loan documents were executed and the loans were initially funded. With the possible exception of the Mountain Thunder logo and artwork (which I will discuss below), the Borrowers' representations and warranties made in the loan documents were true when the Borrowers, the Batemans, and Ms. Decker signed those documents, and the Borrowers and the related grantors owned all of the property in which they purported to grant security interests to GemCap. (Mr. Bateman

---

[88] *Harada v. Ellis*, 60 Haw. 467, 468 (1979).

U.S. Bankruptcy Court - Hawaii   #17-90008   Dkt # 168   Filed  10/02/18   Page 37 of 44

subsequently testified that some of those assets belonged to him personally and were not part of GemCap's collateral, but as I explain in the findings of fact, that testimony was false.)

Settie Safa testified at trial that she is the artist who created, and still owns, "all of the [Borrowers'] beauty and body line product names, logos, label designs, coffee bag designs, promotional signage, marketing banners, brochures, business cards and promotional items . . . ." All of these items are "Intellectual Property" within the meaning of the GemCap loan documents, meaning that the Borrowers and Mr. Bateman represented that the Borrowers owned them and purported to grant security interests in them to GemCap. The court cannot determine, however, whether those representations were false when made. Ms. Safa is not a party to these adversary proceedings, so the court cannot adjudicate her claims. In any event, Mr. Bateman testified that he did not know about Ms. Safa's ownership claims until recently, and there was no evidence to the contrary. Accordingly, GemCap's claims of fraud with respect to ownership of the logos and artwork is unproven.

Mr. Bateman did commit fraud, however, after the initial loan documents were signed. As the findings of fact explain, the Borrowers and the Batemans provided false borrowing base certificates that inflated the amount that the Borrowers were entitled to borrow from GemCap. The borrowing base certificates were statements in writing about the financial condition of the Borrowers. The Borrowers and the Batemans may

38

not have known at first that the borrowing base certificates were false, but after they discovered the error, they continued to provide false borrowing base certificates on a regular basis for two years. They did so for the purpose of inducing GemCap to continue lending money to the Borrowers under the revolving line of credit and to prevent GemCap from declaring a default. They knew that their conduct was substantially certain to injure GemCap. GemCap reasonably relied on the false borrowing base certificates when it lent the an additional $2,049,179.10, an amount which the Borrowers could not and will never be able to repay.

GemCap argues that its entire claim is not dischargeable. It cites the *Tegeler* decision[89] for the proposition that false statements in a borrowing base certificate can render an entire debt nondischargeable. But *Tegeler* is distinguishable. In that case, the false statements were made in the very first borrowing base certificate, before any funds were advanced. In this case, GemCap had advanced millions of dollars to the Borrowers before any false statements were made. In *Tegeler*, all of the advances were made in reliance on the false borrowing base certificate; in this case, only the advances made in reliance on the false borrowing base certificates are nondischargeable. The second case on which GemCap relies, *Cohen v. Third Coast Bank, SSB*,[90] is also distinguishable on the same basis. In that case, the borrower made false statements

---

[89] *Trustmark Nat'l Bank v. Tegeler (In re Tegeler)*, 586 B.R. 598 (Bankr. S.D. Tex. 2018).

[90] 2014 WL 2729608 (E.D. Tex. June 16, 2014).

39

prior to the first loan advance (in addition to false statements in borrowing base certificates), so the entire loan was nondischargeable.

Mr. Bateman's participation in the diversion of $771,669 of GemCap's cash collateral warrants nondischargeability under section 523(a)(6). As I have found, Mr. Bateman knew of GemCap's secured interest in the cash collateral and deliberately caused the Borrowers to spend it rather than depositing the sale proceeds in the lock box account. He knew that his conduct was substantially certain to harm GemCap because he knew that the Borrowers could neither repay the GemCap debt nor replace the diverted cash.

Thus, Mr. Bateman owes a nondischargeable debt to GemCap in the amount of $2,820,848.10 plus interest at the contract rate to the entry of judgment, post-judgment interest at the applicable federal rate, costs, and reasonable attorneys' fees.[91]

4.     Injunctive Relief

Although the Batemans and Ms. Decker opposed the entry of a preliminary injunction, they claim to have complied with it and do not expressly object to its conversion to a permanent injunction. Accordingly, the preliminary injunction should be made permanent.

---

[91] *Cohen v. de la Cruz*, 523 U.S. 213, 223 (1998) ("'any debt . . . for money, property, services, or . . . credit, to the extent obtained by' fraud encompasses any liability arising from money, property, etc., that is fraudulently obtained, including treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor.").

## 5. Contempt of Court

Bankruptcy courts have the inherent power to impose sanctions for contempt and bad faith or vexatious litigation conduct.[92] Section 105(a) of the Bankruptcy Code empowers the bankruptcy court to "tak[e] any action or mak[e] any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."[93]

"The standard for finding a party in civil contempt is well settled: The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court."[94] The automatic stay of section 362 "qualifies as a specific and definite court order."[95]

Next, the movant must show, again by clear and convincing evidence, that the violator knew of the court order and that the order applies to its conduct. This is a subjective test: "Even an unreasonable belief that the stay does not apply to a creditor's claims would preclude a finding of contempt."[96]

---

[92] *Caldwell v. Unified Capital Corp. (In re Rainbow Magazine, Inc.)*, 77 F.3d 278, 284-85 (9th Cir. 1996).

[93] 11 U.S.C. § 105(a).

[94] *Knupfer v. Lindblade (In re Dyer)*, 322 F.3d 1178, 1190-91 (9th Cir. 2003) (internal quotation marks omitted) (citing *Renwick v Bennett (In re Bennet)*, 298 F.3d 1059, 1069 (9th Cir. 2002)).

[95] *RESS Financial Corp. v. Beaumont 1600, LLC (In re The Preserve, LLC)*, 2018 WL 4292023 at *8 (B.A.P. 9th Cir. Sept. 7, 2018) (citing *In re Dyer*, 311 F.3d at 1191).

[96] *Id.*, citing *Lorenzen v. Taggart (In re Taggart)*, 888 F.3d 438, 444 (9th Cir. 2018). The standard for a willful violation under section 362(k) is less stringent, but that section does not apply

U.S. Bankruptcy Court - Hawaii   #17-90008   Dkt # 168   Filed   10/02/18   Page 41 of 44

If the movant makes this showing, the burden then shifts to the contemnors to establish that they were not able to comply,[97] or that they substantially complied, meaning that the contemnors took all reasonable steps to comply.[98]

The remedies for civil contempt can either coerce future compliance or compensate the complainant for the losses suffered from the noncompliance.[99]

There is no doubt that the Batemans and Ms. Decker violated the temporary restraining order and the preliminary injunction, without any plausible excuse. The only question is what remedies should be granted.

In one instance, the Batemans' and Ms. Decker's violations inflicted quantifiable economic loss on GemCap and Palani Farms. As the findings of fact explain, the Batemans' and Ms. Decker's defiance of the temporary restraining order and preliminary injunction has deprived GemCap and Palani Farms of equipment worth $262,300. GemCap is therefore entitled to a judgment against the Batemans and Ms. Decker in the amount of $262,300 which is not dischargeable in Mr. Bateman's bankruptcy. (If the defendants subsequently turn over any of these assets to GemCap or Palani Farms, they may file a motion for a corresponding reduction in the

---

because GemCap is not an "individual."

[97] *In re Count Liberty, LLC,* 370 B.R. 259, 273 (Bankr. C.D. Cal. 2007) (citing *FTC v. Affordable Media, LLC,* 179 F.3d 1228, 1239 (9th Cir. 1999)(quoting *Stone v. City &County of S. F.* , 968 F.2d 850, 856 n. 9 (9th Cir. 1992), *cert. denied*, 506 U.S. 1081 (1993)).

[98] *Id.* at 275 (citation omitted).

[99] *Id.* at 274.

U.S. Bankruptcy Court - Hawaii   #17-90008   Dkt # 168   Filed  10/02/18   Page 42 of 44

amount of the judgment.)

In most cases, however, the record does not permit me to quantify the damages. For example, Mr. Bateman's continued use of the Mountain Thunder name (or other names that he obviously intends to be confusingly similar) and other trademarks included in GemCap's collateral has probably reduced Palani Farms' sales and profits, but the amount of the loss is unknown. The conversion of the preliminary injunction to a permanent injunction will not likely solve the problem: based on his behavior to date, efforts to force Mr. Bateman to comply will probably resemble a game of "whack-a-mole."

Unfortunately, the best the court can do is make the injunction permanent. This will permit GemCap to seek remedies if and when the Batemans and Ms. Decker violate the permanent injunction.

## SUMMARY OF AWARD

Based on these findings of fact and conclusions of law, GemCap is entitled to judgment as follows:

In Adv. Nos. 17-90007 and 17-90008: (1) a permanent injunction on substantially the same terms as the preliminary injunction; (2) a money judgment in the amount of $262,300.00 against the Batemans and Ms. Decker, jointly and severally (which judgment is not dischargeable in Mr. Bateman's bankruptcy case); and (3) costs and reasonable attorneys' fees. Counts IV through X of the complaints

U.S. Bankruptcy Court - Hawaii   #17-90008   Dkt # 168   Filed  10/02/18   Page 43 of 44

seek alternative relief which this disposition renders unnecessary. Count XI of the complaints is not a claim for relief. Therefore, Counts IV through XI shall be dismissed.

In Adv. No. 18-90002, a money judgment against Trent Bateman in the amount of $2,820,848.10 plus costs, reasonable attorneys' fees, prejudgment interest at the applicable contract rate, and postjudgment interest at the applicable federal rate, which judgment is not dischargeable in Mr. Bateman's bankruptcy case.

LBR 7054-1 and 7054-2 govern the taxation of costs and award of attorneys' fees.

Counsel for GemCap shall prepare proposed final judgments, circulate them to counsel for the Batemans and Ms. Decker for approval as to form, and submit them to the court pursuant to LBR 9072-1(d).


### END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

U.S. Bankruptcy Court - Hawaii   #17-90008   Dkt # 168   Filed  10/02/18   Page 44 of 44